## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 27 2018, 6:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dorothy Ferguson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of O.B.;

A.B. (Mother),

*Appellant,*

v.

The Indiana Department of Child Services,

*Appellee.*

April 27, 2018

Court of Appeals Case No.
48A02-1709-JT-2306

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

Trial Court Cause No.
48C02-1701-JT-3

**Pyle, Judge.**

# Statement of the Case

A.B. ("Mother") appeals the termination of the parent-child relationship with her daughter ("O.B."), claiming that there is insufficient evidence to support the termination because the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that the conditions that resulted in O.B.'s removal will not be remedied. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

# Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

O.B. was born in April 2004. In April 2013, O.B.'s aunt and uncle became her guardians ("Guardians"). In June 2015, Mother moved to Mississippi and left O.B. with Guardians. Mother was using drugs at the time and did not have a stable residence. One month later, in July 2015, Guardians took O.B. to a relative's home and explained that they would no longer be able to keep O.B. in their home because of her inappropriate behavior. Guardians explained that

---

[1] O.B.'s father has never been identified.

O.B. had threatened to kill herself and wished that other people would die. She was also refusing to take her insulin as prescribed and was admitted to the hospital because of her high blood sugar. After O.B. was discharged from the hospital, DCS Family Case Manager Kaneshia Tinker ("FCM Tinker") contacted Mother and informed her that O.B. was no longer living with Guardians. When FCM Tinker asked Mother to return to Indiana to begin visiting O.B., Mother hung up the telephone.

[4] That same day, DCS filed a petition alleging that O.B. was a child in need of services ("CHINS"). Following a November 2015 fact finding hearing, the trial court adjudicated O.B. to be a CHINS. In a December 2015 dispositional order, the trial court ordered Mother to: (1) complete a substance abuse assessment; (2) submit to random drug screens; (3) obtain stable employment and housing; and (4) participate in home-based counseling. The trial court also ordered DCS to begin an Interstate Compact on the Placement of Children ("ICPC") so that Mother could be evaluated for services and placements in Mississippi.

[5] DCS completed the ICPC in February 2016. While Mississippi was evaluating whether it was going to accept the ICPC, Mother returned to Indiana.[2] She visited DCS Case Manager Kaylee Jones ("Case Manager Jones") in August 2016 and asked for visitation, home based services, and therapy. Mother

---

[2] Mississippi denied the ICPC in September 2016. Apparently officials in Mississippi could not find Mother. When they went to her home address, a man answered the door and would not let them into the house.

submitted a drug screen, which tested positive for cocaine and alcohol. Children's Bureau Home-Based Case Manager Amy Newton ("Case Manager Newton") attempted to set up referrals for Mother in October 2016, but Mother's telephone was turned off, and DCS had no idea where Mother was living at the time. Mother was subsequently "closed out [of the program] unsuccessfully." (Tr. 16).

[6] After Mother failed to participate in services, DCS filed a petition in January 2017 to terminate her parental rights. Testimony at the June and August 2017 fact finding hearings on the termination petition revealed that Case Manager Jones had not had any contact with Mother from August 2016 until February 2017, when Case Manager Jones had been able to reach Mother by telephone and notify her about the initial termination hearing. Mother explained that she had returned to Mississippi. According to Case Manager Jones, Mother had not complied with any of the court-ordered services. Further, Case Manager Jones had "no idea" where Mother was living in Mississippi. (Tr. 52). According to Case Manager Jones, Mother had previously lived with her sister and "been on the road in a semi driving with another man." (Tr. 53-54). Case Manager Jones explained that Mother was "very transient," which was "completely unstable for [O.B.]" (Tr. 53).

[7] The testimony further revealed that O.B. had had only sporadic contact with Mother on Facebook Messenger. O.B.'s therapist, Abbie Rust ("Therapist Rust"), testified that O.B. was "typically . . . the one reaching out." (Tr. 19). Therapist Rust explained that "continued contact [was] definitely harmful to . .

. [O.B.]" because O.B. had the expectation that Mother would respond appropriately and continuously. However, Mother frequently failed to respond. One time, Mother's friend told O.B. that Mother was "in an unsafe place." (Tr. 20). According to Therapist Rust, such information was "harmful to [O.B.,]" who had struggled with anxiety, depression, and suicidal thoughts. (Tr. 20).

[8] At the time of the hearing, O.B. was in foster care in a preadoptive placement. She was "maintaining her diabetes" and doing well in school. (Tr. 51). The plan for her care was adoption. Case Manager Jones and Court-Appointed Special Advocate Becky Douglas ("CASA Douglas") both testified that termination was in O.B.'s best interest.

[9] Also at the hearing, Mother testified telephonically that she had a house in Mississippi but did not have a job. When asked why she was not in Indiana, Mother stated, "I got no I.D. I can't get on the bus. I got nowhere to go if I go back to Indiana." (Tr. 69). Mother admitted that she had not participated in any court-ordered services.

[10] Following the hearing, pursuant to O.B.'s request, the trial court judge conducted an in camera interview with O.B. In August 2017, the trial court issued a detailed eight-page order that terminated Mother's parental relationship with O.B. Mother appeals.

# Decision

[11] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re*

*K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[12] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id*. Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[13] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> > (C) that termination is in the best interests of the child; and
>
> > (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[14] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that the conditions that resulted in O.B.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to O.B.'s well-being.

[15] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.2d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*. We therefore discuss only whether there is a reasonable probability that the conditions that resulted in O.B.'s removal or the reasons for her placement outside Mother's home will not be remedied.

[16] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[17] Here, our review of the evidence reveals that O.B. was placed outside the home when Guardians could no longer manage her behavior or her diabetes. O.B. could not return to Mother's care because Mother was in Mississippi and showed no interest in returning to Indiana to visit or care for O.B. After O.B. was adjudicated to be a CHINS, DCS attempted to set up an ICPC so that Mother could receive services in Mississippi. However, officials in Mississippi could not locate Mother. Although Mother eventually returned to Indiana, she

failed to participate in any of the court-ordered services. The one drug screen that she submitted tested positive for cocaine and alcohol. At the time of the termination hearing, Mother had returned to Mississippi and had no plans to return to Indiana. Also at the time of the hearing, O.B. was in foster care in a preadoptive placement. She was maintaining her diabetes and doing well in school. Both Case Manager Jones and CASA Douglas testified that termination was in O.B.'s best interests. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted O.B.'s removal would not be remedied. We find no error.

[18] Affirmed.

Kirsch, J., and Bailey, J., concur.